# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON CARRODINE, ELI REISMAN, and KIMBERLY HUDSON, *individually and on behalf of all others similarly situated,*<br><br>                    Plaintiff,<br><br>          v.<br><br>FLATIRON MEDIA, LLC and HASE.COM LLC f/k/a UNLIMITED TRAFFIC LLC d/b/a "HasTraffic",<br><br>                    Defendants. | Case No.: 1:22-cv-09660-JMF<br><br>FIRST AMENDED CLASS-ACTION COMPLAINT<br><br><br><br>Jury Trial Demanded |

## FIRST AMENDED CLASS-ACTION COMPLAINT

COMES NOW Plaintiffs Jason Carrodine ("Carrodine"), Eli Reisman ("Reisman"), Kimberly Starling ("Starling") and Kimberly Hudson ("Hudson") (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, and for their First Amended Class-Action Complaint against Defendants Flatiron Media, LLC ("Flatiron") and HasE.com LLC f/k/a Unlimited Traffic LLC d/b/a HasTraffic ("HasTraffic"). Plaintiffs allege as follows:

### BACKGROUND ON TCPA

1.    In the early 1990s, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to

be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

2.      The TCPA, through the accompanying FCC regulations, 47 C.F.R. § 64.1200(c) et seq., affords special protections for "residential subscribers" who register their phone numbers on the National Do Not Call Registry.

3.      Since 2003, persons who register cell phone numbers on the Do Not Call registry have been considered to be "residential subscribers" for the purpose of 227(c)(5) and the Do Not Call registry. In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

4.      47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) provide that each person who receives more than one call within a 12-month period on their phone, where that called party did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered on the National Do Not Call Registry for more than 31 days is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated.

5.    Decades after the TCPA passed into law, it is still unfortunately the case that "[m]onth after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." Omnibus TCPA Order, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

6.    In fact, in 2021 alone, there were over five million complaints from Americans to the FTC about unwanted telemarketing calls.  Federal Trade Comm'n, FTC Issues Biennial Report to Congress on the National Do Not Call Registry (Jan. 5, 2022) available at: https://www.ftc.gov/news-events/news/press-releases2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

7.    The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. See Sarah Krouse, The FCC Has Fined Robocallers $208 Million. It's Collected $6,790, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## PARTIES

8.    Plaintiff Carrodine is an individual, who was at all times relevant to this

action, a resident and citizen of the State of Nevada.

9.     Plaintiff Reisman is an individual, who was at all times relevant to this action, a resident and citizen of the State of New Jersey.

10.    Plaintiff Hudson is an individual, who was at all times relevant to this action, a resident and citizen of the State of Texas.

11.    Each Plaintiff is a "person" as that term is defined by 47 U.S.C. §153(39).

12.    Flatiron is a New York limited liability company with its headquarters in New York and, thus, a citizen of New York. Flatiron has been in good standing to transact business at all times relevant to this Amended Complaint.

13.    Flatiron describes itself as a "full-service customer acquisition service provider" that assists clients in "lead generation."

14.    Flatiron's lead generation business includes the operation of websites purporting to offer consumer opportunities to claim prizes, rewards and to enter "sweepstakes."

15.    Flatiron maintains its primary office at 20 West 22nd Street #908, New York, NY 10010.

16.    Flatiron transacts business in New York and throughout the United States.

17.    Flatiron is a "person" as that term is defined by 47 U.S.C. §153(39).

18.     Flatiron acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

19.     Defendant HasTraffic is a limited liability company incorporated in Montana.

20.     HasTraffic is a digital and SMS text message marketing company that purports to generate leads and increase traffic to commercial webpages and online businesses, such as Flatiron.

21.     HasTraffic maintains an office at 1001 S. Main St., 700, Kalispell, Montana 59901.

22.     HasTraffic can be served through its registered agent "All Day $49 Montana Registered Agent LLC", at 1001 S. Main Street Suite 49, Kalispell, Montana 59901.

23.     HasTraffic is a "person" as that term is defined by 47 U.S.C. §153(39).

24.     HasTraffic acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. See *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

26.     This Court has personal jurisdiction over Defendant Flatiron, which is headquartered and systematically conducts business in the State of New York.

27.     While Defendant HasTraffic is incorporated and headquartered in Montana, upon information and belief, HasTraffic continuously and systematically does business in the State of New York.

28.     On its webpage, HasTraffic lists its primary phone number as (917) 464-3783, which is a New York number.  See https://home.hastraffic.com/ (as of May 2, 2023).

29.     By doing business out of New York and listing a phone number with a New York area code, it is reasonably foreseeable that HasTraffic would be haled into court in the State of New York.

30.     Furthermore, HasTraffic was acting on behalf of Flatiron, a New York company.

31.     HasTraffic sent telemarketing text messages to consumers in order to generate profit for its New York-based principal, Flatiron.

32.     Furthermore, HasTraffic sent text messages to Plaintiffs and putative class-members that originated from New York phone numbers.

33.     For instance, HasTraffic sent Reisman messages from area codes "845' and 516" that are associated with New York.  HasTraffic also sent text messages to Hudson from a "917" area code, also associated with New York.

34.     Additionally, upon information and belief, Flatiron paid HasTraffic for "leads" from its New York bank account(s).

35.     For those reasons, this Court has personal jurisdiction over HasTraffic.

36.     Furthermore, because Flatiron is headquartered in this District and a substantial portion of the occurrences and transactions underlying this action occurred within this District, venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## FACTUAL BACKGROUND

### A. Flatiron and HasTraffic's Spam Messaging Venture

37.     Flatiron describes itself as a "full-service customer acquisition service provider." Flatiron states that it can assist in customer acquisition through using "lead generation" and "SMS communications."

38.     Part of Flatiron's business is "lead generation" for its clients. Flatiron represents on its website that its "lead generation" services are "TCPA compliant."

39.     Flatiron represents on its website that it generates more than "50 million client leads year after year" and that some of these leads are generates through "SMS [campaigns]."

40.     "SMS" stands for "Short Message Service" and refers to standard text messages sent to cellular phones.

41.     Flatiron boasts on its webpage that it uses "3rd party and proprietary systems" and that it "Flatiron makes sure that your offer is where it is supposed to be, displayed how it is supposed to display and is in front of the consumer who needs to see it."

42.     As it relates to this matter, the "3rd party" Flatiron hired to implement its aggressive SMS text message campaign is co-Defendant HasTraffic.

43.     HasTraffic is a digital and SMS text message marketing company that promises to expand clients' reach through mass text message campaigns.

44.     Flatiron and HasTraffic entered into a contract for services.  Through that contract, FlatIron agreed to pay HasTraffic based on the number of "leads" HasTraffic generated for Flatiron /or the quantity of traffic to Flatiron's webpage(s).

45.     In that contract, Flatiron retained the ability to substantially control the marketing activities of HasTraffic.

46.     HasTraffic sent thousands of spam text messages on behalf of Flatiron in furtherance of their contractual venture purporting to offer "gas cards" and prizes to consumers.

## B. **Facts Specific to Carrodine**

47.     At all times relevant to this action, Carrodine was the owner, subscriber and primary user of a cell phone. The phone number associated with his cell phone is 702-XXX-9862.

48.     Carrodine registered his number on the Do-Not-Call registry on October 23, 2014, to obtain solitude from unwanted telemarketing calls and text messages.

49.     Carrodine used his cell phone/number primarily for personal purposes, namely, to communicate with friends and family members.

50.     Before HasTraffic and Flatiron commenced their telemarketing campaign, Carrodine had never heard of either company and did not provide either company express written consent to send him marketing text messages.

51.     Carrodine has no prior business relationship with Flatiron.

52.     Carrodine never inquired of Flatiron about any of its services before or at the time he received the text messages at issue.

53.     Carrodine received at least two text messages on his phone from

HasTraffic on behalf of Flatiron.

54.     On or about May 9, 2022, Carrodine received a cryptic text message on his cell phone from Flatiron. The phone number that appeared on Carrodine's phone was 1-360-643-5409. The text message stated: "Fuel c89NA.com/t6T5UTHQ."

55.     So as to determine who was sending him the text message, Carrodine clicked the link. Upon clicking the link, Carrodine was directed to a website that asked questions regarding gas prices, how often he filled up his gas tank and how many he miles he drives each week. The website had no indicia of who owned or operated the website.

56.     As the website with the questionnaire did not identify who was responsible for the marketing, Carrodine answered the three questions on the website to determine who was sending the text messages.

57.     Upon answering the three questions, a box popped up on the screen directing Carrodine to click a "claim" button to "proceed toward" a prize.

58.     Carrodine clicked the "claim" button so as to determine who sent him the unsolicited text message. Upon clicking the "claim" button, Carrodine was directed to a website with address "everydaywinner.com" which asked Carrodine to enter his email address for a chance to "win $500 toward fuel."

59.     Carrodine did not submit his phone number or submit any information that could reasonably be construed as consent to place telemarketing calls/texts

while on the subject website.

60.     The website also included a box that could be check to purportedly "double" Carrodine's chance of winning. By clicking the box, Carrodine would receive "offers from **our** marketing partners."

61.     The bottom of the website finally identified Flatiron as the source of the text message.  The website states, in part, "Welcome to Flatiron Media's suites of content and promotions websites."   A true and correct copy of the Flatiron webpage arising from the text message sent to Carrodine by HasTraffic is copied below:



62.     The website further states that "Everyday Winner is a trademark of Flatiron Media, LLC."

63.     The website also includes a privacy policy which is titled "Flatiron

Privacy Policy."

64.    The aforementioned transactions on May 9, 2022 shed light on a perplexing text message Mr. Carrodine had received only two days prior.

65.    Specifically, two days before the May 9 text message, on May 7, 2022, Carrodine received a similar cryptic text message on his phone from Hastraffic on behalf of Flatiron. The phone number that appeared on Carrodine's phone as associated with the text message was 1-818-619-6846. The text message stated: "Gasoline is mean 7Tx31.com/t6T5UTHQ."

66.    Details of the messages sent to Carrodine are summarized in the chart below:

| Date | Number of texting party | Message | Landing page after questionnaire |
|------|------------------------|---------|----------------------------------|
| 5-7-2022 | 1-818-619-6846 | "Gasoline is mean 7Tx31.com/t6T5UTHQ." | everydaywinner.com |
| 5-9-2022 | 1-360-643-5409 | "Fuel c89NA.com/t6T5UTHQ." | everydaywinner.com |

67.    Flatiron's conduct violated the privacy rights of Carrodine and the putative class members, as they were subjected to annoying and harassing text messages. Flatiron's text messages intruded upon the rights of Carrodine and the putative class members to be free from invasion of their interest in seclusion.

68.    Carrodine found the SMS messages to be annoying, invasive and distracting.

### C. Facts as to Eli Reisman

69.     At all times relevant hereto, Reisman owned a call phone, the number for which was (848) XXX-8097

70.     Reisman's cell phone account/number is registered in his individual name and not in the name of a business.

71.     Reisman's number is a residential line.

72.     Reisman uses the cell phone/number primarily for personal purposes, namely, to communicate with friends and family members.

73.     Reisman registered his number on the Do-Not-Call registry on April 24, 2019 in order to obtain solitude from unwanted telemarketing calls and text messages.

74.     Reisman used his aforementioned cell phone for primarily residential purposes, such as talking with friends and family.

75.     Before HasTraffic and Flatiron commenced their telemarketing campaign, Reisman had never heard of either company and certainly did not provide either company express written consent to receive marketing messages.

76.     Further, Reisman did not have an established business relationship with either company.

77.     On November 20, 2022, HasTraffic sent Reisman a text message on behalf of Flatiron from the number (437) 217-5156 reading "I am ready to mail the $ 499 Gas card that you might have won, set delivery info here klwytc.com/s6AByTfkHb."

78.     Reisman clicked the link in order to ascertain the party/parties texting him without consent.

79.     Upon doing so, Reisman's browser landed on "rewardmonkey.net", which purported to contain a sweepstakes and promotional offer of a $500 gas card.

80.     Thereafter, the website presented a series of questions inquiring about the user's driving habits and instructed Reisman to click a link to "claim a prize."

81.     After those items were completed, the sponsor of that "sweepstakes" was disclosed to be Flatiron.

82.     Specifically, the bottom of the website offering the purported $500 gas card read "Welcome to one of Flatiron Media's suites of content and promotion websites.  A true and correct copy of that image is copied below.



83.    In addition to the November 17, 2022 text messages described above, Reisman received at least three additional text messages from HasTraffic on behalf of Flatiron that were substantially similar to the first message.

84.    A chart summarizing the four text messages (including the aforementioned November 17, 2022 text) follows below:

| Date | Number of texting party | Message | Landing page after questionnaire |
|------|------------------------|---------|----------------------------------|
| 11-17-2022 | (845) 784-9847 | ACTION REQUIRED: You might have won a $500 giftcard! Do you want an online voucher or Debt Card shipped? Ovalypatient.com/ORGJdpEy s6AbqpA | Everydaywinner.com |
| 11-20-2022 | (437) 217-5156 | I am ready to mail the $ 499 Gas card that you might have | Everydaywinner.com |

| | | won, set delivery info here klwytc.com/s6AByTfkHb. | |
|---|---|---|---|
| 11-24-2022 | (949) 418-3382 | Let Me Know Where To Ship The $500 Giftcard YOU might have Won! Urbanycud.com/d084EWMA cx1yWQL | Everydaywinner.com |
| 12-29-2022 | (516) 423-6784 | FOOD STAMPS: You are qualified to get $300 SNAP in Jan: ohazodu.me/TgdVcsoZoE | Everydaywinner.com |

85.     On or around Nov. 21, 2022, after receipt of the first two text messages, Resiman wrote to Flatiron and advised, *inter alia,* that he did not consent to the text messages.

86.     Furthermore, on November 24, 2022, after receipt of the third text message, Reisman wrote to the texting party with the clear instruction "STOP."

87.     Despite those instructions to cease and desist communications, HasTraffic sent at least two additional marketing messages to Reisman, on behalf of Flatiron.

88.     Reisman found the aforementioned text messages to be annoying, distracting and an invasion of his privacy.

### D. Facts as to Kimberly Hudson

89.     Hudson is an individual who at all times relevant to this Amended Complaint has been a citizen of the State of Texas.

90.     At all times relevant to this Amended Complaint, Hudson owned a cell phone, the number for which was (817) XXX-8035

91.     Hudson registered her number on the Do-Not-Call registry on October 17, 2009 in order to obtain solitude from unwanted telemarketing calls and text messages.

92.     Hudson used her cell phone for primarily residential purposes, such as communicating with friends and family.

93.     Before HasTraffic and Flatiron commenced their telemarketing campaign, Hudson had never heard of either company and did not provide either company express written consent to send her marketing text messages.

94.     Furthermore, Hudson did not have an established business relationship with either company.

95.     On May 7, 2022, HasTraffic sent Hudson a text message on behalf of Flatiron from the number purported phone number 650-675-8557, stating, "Fuel for the fire hwwBJ.com/JsauclQq."

96.     Hudson clicked the link to ascertain the party/parties texting her without her consent.

97.     Upon   clicking   the   link,   Hudson's   browser   landed   on "validrewards.com", which purported to contain a sweepstakes and promotional offer of a $500 prepaid card to be used for gas.

98.    The website also presented a series of questions inquiring about the user's driving habits and instructed Hudson to click a link to "claim a prize."

99.    Upon clicking the link, Hudson was directed to a website called "validrewards.com."

100.    Specifically, the bottom of the website offering the purported $500 gas card read "Welcome to one of Flatiron Media's suites of content and promotion websites."  A true and correct copy of an image from the Flatiron website captured by Hudson is copied below:



101.    In addition to the May 7, 2022 text message described above, Hudson received at least two additional text messages from HasTraffic on behalf of Flatiron that were substantially similar to the first message.

102.    In fact, each text message has the same ending to the website referenced in the text message of "JsauclQq."

103.    The following chart identifies the text messages received by Hudson:

| Date | Number of texting party | Message | Landing page after questionnaire |
|------|------------------------|---------|----------------------------------|
| 5-7-2022 | (650) 784-9847 | Fuel for the fire hwwBJ.com/JsauclQq | Validrewards.com |
| 5-16-2022 | (626) 766-0994 | gasoline is mean ayQKi.com/JsauclQq | Validrewards.com |
| 5-18-2022 | (917) 459-5236 | Be prepared 1N2rV.com/JsauclQq | Validrewards.com |

104.   Hudson found the aforementioned text messages to be annoying, distracting and an invasion of her privacy.

### **Direct and Vicarious Liability**

105.   On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have

> thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 FCC Rcd 6574 at 6588 (F.C.C. May 9, 2013) (internal citations omitted).

106.    Moreover, the 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.*, at 6587 n. 107.

107.    The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

108.    Upon information and belief, Flatiron and HasTraffic entered into a contract for services.  Through that contract, FlatIron agreed to pay HasTraffic based on the number of "leads" HasTraffic generated for Flatiron /or the quantity of traffic to Flatiron's webpage(s).

109.    In that contract, Flatiron retained the ability to substantially control the marketing activities of HasTraffic.

110.   As HasTraffic explains "The advertiser has control over the text and the ability to pre-approve the copy."  An image copied from HasTraffic's webpage is below (highlight added):



111.   Pursuant to the agreement between HasTraffic and Flatiron, HasTraffic sent SMS text messages on Flatiron's behalf while acting at the direction and under the control of Flatiron.

112.   Because Flatiron had the ability to direct and control the business activities of HasTraffic when it was sending marketing messages on Flatiron's behalf, an agency relationship exists.

113.   Accordingly, the violations of HasTraffic in the course of marketing for Flatiron can reasonably be imputed to Flatiron under the theory of "actual authority" or a traditional agency relationship.

114.   Furthermore, given the widespread and pervasive TCPA violations in messages purporting to offer rewards and sweepstakes, Flatiron had reason to

carefully scrutinize the marketing activities of HasTraffic while HasTraffic was acting on Flatiron's behalf.

115.   More immediately, Flatiron was aware of complaints from consumers about the persistent unwanted text messages.

116.   For instance, on or around July 30, 2020, a consumer made the following complaint to the BBB about Flatiron's telemarketing practices:

> "Whoever those people are need to stop because they text me several times a day offering gifts and money."

117.   By accepting "leads" that came by way of HasTraffic's unlawful telemarketing, where Flatiron had reason to know of the violations, Flatiron ratified HasTraffic's TCPA violations.

118.   Upon information and belief, Defendant Flatiron hired, encouraged, permitted, and enjoyed the benefits of mass spam-marketing by HasTraffic.

119.   Flatiron is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from HasTraffic's TCPA violations.

120.   For the counts identified below, any unlawful marketing messages made by HasTraffic on Flatiron's behalf, Flatiron is vicariously liable and HasTraffic is directly liable.

## Class Allegations

121.   Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiffs bring this lawsuit as a class action on behalf of himself and all others similarly situated.

122.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Carrodine seeks to represent the following class:

> **Do-Not-Call Registry Class:** For the period from four years prior to the filing of this suit until the date a class is certified, all persons in the United States who: (1) received more than one telephone call or SMS message from HasTraffic on behalf of Flatiron; (2) advertising goods or services; (3) during a 12-month period; (4) to a residential telephone number; and, (5) to a phone number that was registered on the Do Not Call Registry for 31 or more days at the time the calls were placed.

123.   Plaintiffs reserve the right to add administrative subclasses, or to amend the definition of the proposed class, as circumstances dictate.

124.   The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds or thousands of people have been harmed by Flatiron and HasTraffic's actions. The names and phone numbers of the members of the proposed class are readily identifiable through records available to Flatiron and/or HasTraffic (or others acting on their behalf).

125.   Members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

126.   On information and belief, Flatiron and HasTraffic has sent text messages to and continues to text people who are registered on the National Do-Not-Call Registry. It is reasonable to expect that Defendants will continue to make such calls absent this lawsuit.

127.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

a.  Whether HasTraffic sent text messages to Plaintiffs and the putative class members after they were registered on the National Do Not Call Registry more than 31 days;

b.  Whether Defendants' conduct violates 47 U.S.C. § 227(c);

c.  Whether Defendants' conduct violates the rules and regulations implementing the TCPA;

d.  Whether Flatiron's contract and business relationship with HasTraffic creates an agency relationship;

e.  Whether Flatiron ratified violations by HasTraffic;

f.  Whether Flatiron created apparent authority as to marketing messages from HasTraffic on its behalf; and,

g.  Whether Plaintiffs and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendants' conduct.

128.   Plaintiffs' claims are typical of the claims of the proposed class members because his claims arise from the same practice that gives rise to the claims of the members of the proposed class and is based on the same legal theories.

129.    Plaintiffs and their counsel counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the proposed class they seeks to represent. Plaintiffs have retained lawyers who are competent and experienced in class action, TCPA litigation and consumer law.

130.   Plaintiffs' counsel will vigorously litigate this case as a class action, and Plaintiffs' and his counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

131.   A class action is superior to all alternative methods of adjudicating this controversy, including through individual lawsuits. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

132.   In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

133.   Questions of law and fact, particularly the propriety of calling phone numbers registered on the National Do-Not-Call Registry, predominate over questions affecting only individual members.

134.   Defendants acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## Count I - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 .S.C. § 227 *et seq.*

135.   Carrodine incorporates by reference paragraphs 1-8, 11-69, and 106-135 as though fully set forth herein.

136.   Reisman incorporates by reference paragraphs 1-7, 9, 11-46, 70-89, and 106-135, as though fully set forth herein

137.   Hudson incorporates by reference paragraphs 1-7, 10-46, and 90-135, as though fully set forth herein

138.   The TCPA defines a "telephone solicitation" as a "call or message for the purpose of encouraging the purchase of goods, or services which is transmitted

to any person." 47 U.S.C. § 227(a)(4).

139.   The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do-Not-Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

140.   The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the National Do Not Call Registry is $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

141.   In addition, the TCPA allows the Court to enjoin Defendants' violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

142.   By sending marketing messages to Plaintiffs and the putative class members after their numbers were registered on the National Do-Not-Call Registry, Defendants violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

143.   Defendants knew or should have known that Plaintiffs and the putative class members had their numbers registered on the National Do-Not-Call Registry.

144.   Plaintiffs and the putative class members are each entitled to damages of $500.00 per violation for each call made by HasTraffic on behalf of Flatiron and

up to $1,500.00 per violation if the Court finds that Defendants willfully violated the TCPA.

## Demand for Judgment

WHEREFORE Plaintiff Jason Carrodine, Eli Reisman and Kimberly Hudson individually, and on behalf of all others similarly situated, requests the Court grant the following relief:

a.      Enter an order against Defendants Flatiron Media, LLC and HasE.com LLC f/k/a/ Unlimited Traffic LLC d/b/a HasTraffic, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying this action as a class action and appointing Carrodine as the class representative;

b.      Enter an order appointing Kimmel & Silverman, P.C. and Butsch Roberts & Associates LLC as class counsel;

c.      Enter judgment in favor of Plaintiffs and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation of 47 U.S.C. § 227(b) and $500 per violation of 47 U.S.C. § 227(c), or up to $1,500 per violation of each subsection if Defendants willfully violated the TCPA;

d.      Enter a judgment in favor of Plaintiffs and the putative class that enjoins Flatiron from violating the TCPA's regulations prohibiting Defendants from calling numbers registered on the National Do-Not-Call Registry;

e.      Award Plaintiffs and the class all expenses of this action, and requiring

Defendants to pay the costs and expenses of class notice and administration; and,

f.      Award Carrodine, Reisman and Hudson and the class such further and

other relief the Court deems just and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Please take notice that Plaintiffs demands a jury trial in this case.

Dated:  May 3, 2023                    Respectfully submitted,


KIMMEL & SILVERMAN, P.C.

By: */s/ Craig T. Kimmel*
Craig T. Kimmel
Jacob U. Ginsburg (admitted *pro hac vice*)
30 East Butler Ave.
Ambler, PA 19002
Phone: (215) 540-8888 ext. 148
Facsimile: (877) 788-2864
Email: kimmel@creditlaw.com
jginsburg@creditlaw.com
teamkimmel@creditlaw.com

BUTSCH ROBERTS & ASSOCIATES LLC

Christopher E. Roberts (*pro hac* in progress)
231 S. Bemiston Avenue, Suite 260
Clayton, Missouri 63105
Telephone: (314) 863-5700
Facsimile: (314) 863-5711
Email: DButsch@butschroberts.com
CRoberts@butschroberts.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jacob U. Ginsburg, Esq. hereby certify that a true and correct copy of the foregoing was served on all parties of record via ECF on May 3, 2023.

/s/ Jacob U. Ginsburg