## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JASON CARRODINE, ELI REISMAN, and KIMBERLY HUDSON, *individually and on behalf of all others similarly situated,*<br><br>               Plaintiff,<br><br>v.<br><br>FLATIRON MEDIA, LLC, UNLIMITED TRAFFIC LIMITED, SEA RANCH INTERNATIONAL LIMITED and SEA RANCH INTERNATIONAL PTE. LTD,<br><br>               Defendants. | Case No.: 1:22-cv-09660-JMF<br><br>THIRD AMENDED CLASS-ACTION COMPLAINT<br><br><br>Jury Trial Demanded |

## THIRD AMENDED CLASS-ACTION COMPLAINT

COMES NOW Plaintiffs Jason Carrodine ("Carrodine"), Eli Reisman ("Reisman"), and Kimberly Hudson ("Hudson") (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, and for their Third Amended Class-Action Complaint against Defendants Flatiron Media, LLC ("Flatiron"), and Defendant Unlimited Traffic Limited, Defendant Sea Ranch International Limited and Defendant Sea Ranch International Pte. Ltd. (the last three defendants are collectively referred to as "HasTraffic" and together with Flatiron are collectively referred to as "Defendants"). Plaintiffs allege:

## BACKGROUND ON THE TCPA

1.    In the early 1990s, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

2.    The TCPA, through the accompanying FCC regulations, 47 C.F.R. § 64.1200(c) et seq., affords special protections for "residential subscribers" who register their phone numbers on the National Do Not Call Registry.

3.    Since 2003, persons who register cell phone numbers on the Do Not Call registry have been considered to be "residential subscribers" for the purpose of 227(c)(5) and the Do Not Call registry. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

4.    47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c) provide that each person who receives more than one call within a 12-month period on their phone, where that called party did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered

on the National Do Not Call Registry for more than 31 days is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated.

5.     Decades after the TCPA passed into law, it is still unfortunately the case that "[m]onth after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." Omnibus TCPA Order, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

6.     In fact, in 2021 alone, there were over five million complaints from Americans to the FTC about unwanted telemarketing calls.  Federal Trade Comm'n, FTC Issues Biennial Report to Congress on the National Do Not Call Registry (Jan. 5,     2022)     available     at:     https://www.ftc.gov/news-events/news/press-releases2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry.

### PARTIES

7.     Plaintiff Carrodine is an individual, who was at all times relevant to this action, a resident and citizen of the State of Nevada.

8.     Plaintiff Reisman is an individual, who was at all times relevant to this action, a resident and citizen of the State of New Jersey.

9.     Plaintiff Hudson is an individual, who was at all times relevant to this action, a resident and citizen of the State of Texas.

10.     Each Plaintiff is a "person" as that term is defined by 47 U.S.C.

§153(39).

11.     Defendant Flatiron is a New York limited liability company with its headquarters in New York and, thus, a citizen of New York. Flatiron has been in good standing to transact business at all times relevant to this Second Amended Complaint.

12.     Flatiron describes itself as a "full-service customer acquisition service provider" that assists clients in "lead generation."

13.     Flatiron's lead generation business includes the operation of websites purporting to offer consumer opportunities to claim prizes, rewards and to enter "sweepstakes."

14.     Flatiron maintains its primary office at 20 West 22nd Street #908, New York, NY 10010.

15.     Flatiron transacts business in New York and throughout the United States.

16.     Flatiron is a "person" as that term is defined by 47 U.S.C. §153(39).

17.     Flatiron acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

18.    Defendant, Unlimited Traffic Limited, is a Hong Kong S.A.R. corporation with an address of 2002B-4A, 20/F, Tower 5, China Hong Kong City, 33 Canton Road, Tsim Sha Tsui, Hong Kong, S.A.R.

19.    Sea Ranch International Limited, is a Hong Kong S.A.R. corporation with address of 2002B-4A, 20/F, Tower 5, China Hong Kong City, 33 Canton Road, Tsim Sha Tsui, Hong Kong, S.A.R.

20.    Defendant Sea Ranch International Pte. Ltd., is a Singapore corporation with an address of 6 Shenton Way #39-02 OUE Downtown Singapore 068809.

21.    At all times relevant, Unlimited Traffic Limited, Sea Ranch International Limited and Sea Ranch International Pte. Ltd. acted in concert, had common ownership, common employees and did business as a joint enterprise called "HasTraffic."

22.    Defendant Flatiron confirmed its contractual relationship with "HasTraffic" was entered into with Unlimited Traffic Limited, Sea Ranch International Limited and Sea Ranch International Pte. Ltd, collectively.

23.    HasTraffic acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

25.    This Court has personal jurisdiction over Defendant Flatiron, which is headquartered and systematically conducts business in the State of New York.

26.    While HasTraffic consists of three separate corporate entities in Singapore and Hong Kong, HasTraffic continuously and systematically transacts business in the State of New York.

27.    HasTraffic entered into multiple contracts with Flatiron, who is located in New York, and supplied such services to Flatiron in New York, including sending many of the text messages at issue from New York area codes.

28.    Between August 2020 and April 2023, HasTraffic entered into six contracts with Flatiron.

29.    HasTraffic sent multiple invoices to Flatiron in New York and addressed those to Flatiron's New York address for HasTraffic's services, including the SMS services that are issue in this case (and received payment for those

invoices). These invoices include but are not limited to: February 11, 2021 - $1,000;

May 19, 2022 - $50,000; May 23, 2022 - $50,000; July 19, 2022 - $50,000; July 21,

2022 - $50,000; and July 26, 2022 - $50,000.

30.    Flatiron paid HasTraffic's invoices via wire transfers from its New

York bank account(s). HasTraffic was aware of this and when Flatiron asked

HasTraffic if they could pay by credit card instead of wire, HasTraffic's

representative encouraged Flatiron to keep paying via wire transfer. On information

and belief, there are additional invoices besides those identified here for which

HasTraffic received payment.

31.    As part of those contracts, HasTraffic tracked the traffic sources for

Flatiron so that Flatiron could know precisely for what services it was paying.

32.    On information and belief, HasTraffic or those acting on their behalf

sent the text messages on Flatiron's behalf to persons with New York area codes.

33.    HasTraffic committed at least some of the offending acts at issue in the

state of New York as some of the text messages originated from phone numbers

bearing New York area codes.

34.    On its webpage, HasTraffic listed its primary phone number as (917)

464-3783, which is a New York number. A true and correct image from

HasTraffic's webpage (which has since been deleted) is copied below:

**Get in touch with us**

Call us at +1 917 464-3783 or send a message to contact@hastraffic.com
(mailto:contact@hastraffic.com)

35.    Among other things, by doing business in New York and listing a phone number with a New York area code, it is reasonably foreseeable that HasTraffic would be brought into court in the State of New York.

36.    Furthermore, HasTraffic was acting on behalf of Flatiron, a New York company.

37.    HasTraffic sent telemarketing text messages to consumers to generate profit for its New York-based principal, Flatiron.

38.    Furthermore, HasTraffic sent text messages to Plaintiffs and putative class-members that originated from New York phone numbers.

39.    For instance, HasTraffic sent Reisman messages from area codes "845" and "516," area codes that are associated with New York.  HasTraffic also sent text messages to Hudson from a "917" area code, an area code also associated with New York.

40.    HasTraffic sent thousands of correspondences to Flatiron employees in New York through e-mail, slack, and phone, in connection with their SMS marketing

venture, including about the text messages at issue. For example, Michael Asselta, the account manager for HasTraffic, sent an e-mail to Mike Kaplan, the Director of Online Marketing for Flatiron about an "SMS chat flow" that concerned various Flatiron brands, including, but not limited to the brand "EverydayWinner."

41.    Mr. Kaplan then stated to Mr. Asselta, "So if I'm getting this right this a generic initial text and if the user seems interested then our office is sent. So how would it work for our offers being sweeps? (sic) Would it be something like, 'Hey Bob, do you have any interest in winning free money today?' and if the answer is yes then a second message like, 'That's great news because EverydayWinner is giving away $500 today and every day. Just click here for your free entry'?"

42.    Mr. Asselta then responded to Mr. Kaplan's e-mail stating, "Yea exactly it would be something like this. If the user complains and says they didn't want to get the text, you tell us the phone number and we will track down the opt in, the op and the time stamp of the opt in within 24 hours. We work directly with the publishers on this and send them all relevant info."

43.    HasTraffic has also conducted business in New York through other means. For example, during the class period, HasTraffic was the "Titanium and WiFi Sponsor" of a conference held in New York called "Affiliate Summit East."

44.    Moreover, HasTraffic's founder, Yancy Naughton, admits that HasTraffic routinely conducts business in New York.  In an interview conducted

during the class period, Mr. Naughton was asked which animal he was most likened

to. He responded, "A deer. It crosses the road at the same spot and although I travel

150K+ miles a year on a plane, I am to hit the same handful of places such as . . .

New York in the US for instance."

45.    For those reasons, and for those detailed in this Complaint, this Court

has personal jurisdiction over HasTraffic.

**46.**    Furthermore, because Flatiron is headquartered in this District and a

substantial portion of the occurrences and transactions underlying this action

occurred within this District, venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1)

and (2).

## FACTUAL BACKGROUND

### A. <u>Flatiron and HasTraffic's Spam Messaging Venture</u>

47.    Flatiron describes itself as a "full-service customer acquisition service

provider." Flatiron states that it can assist in customer acquisition through using

"lead generation" and "SMS communications."

48.    Part of Flatiron's business is "lead generation" for its clients. Flatiron

represents on its website that its "lead generation" services are "TCPA compliant."

49.    Flatiron represents on its website that it generates more than "50 million

client leads year after year" and that some of these leads are generates through "SMS

[campaigns]."

50.    "SMS" stands for "Short Message Service" and refers to standard text messages sent to cellular phones.

51.    Flatiron boasts on its webpage that it uses "3rd party and proprietary systems" and that it "Flatiron makes sure that your offer is where it is supposed to be, displayed how it is supposed to display and is in front of the consumer who needs to see it."

52.    As it relates to this matter, the "3rd party" Flatiron hired to implement its aggressive SMS text message campaign is HasTraffic.

53.    HasTraffic is a digital and SMS text message marketing conglomerate that promises to expand clients' reach through mass text message campaigns.

54.    Flatiron and HasTraffic entered into a contract for services.  Through that contract, Flatiron agreed to pay HasTraffic based on the number of "leads" HasTraffic generated for Flatiron /or the quantity of traffic to Flatiron's webpage(s).

55.    In that contract, Flatiron retained the ability to substantially control the marketing activities of HasTraffic and HasTraffic has the ability to control the activities of anyone sending text messages on its behalf.

56.    As one of many examples, HasTraffic's representative advised a Flatiron representative via e-mail, "This week will be tested also generic SMS (i.e. not targeted creative) for a relatively low price, but we will have to be watching the

quality closely, especially the first days. This is ts566 and could be potentially another big source."

57.     HasTraffic then contracted with various telemarketers to send SMS text messages to consumers, promoting Flatiron's webpages.

58.     HasTraffic and Flatiron had an understanding between them, that the identities of the telemarketers sending the SMS text messages would remain unknown to Flatiron. As one example, a publisher would only be identified to Flatiron by letters and numbers such as "ts5635."

59.     HasTraffic assured Flatiron that the SMS text messages would follow a prescribed format and include specific language and link to Flatiron's promotional webpages.

60.     HasTraffic's telemarketing vendors include, but are not limited to, Power SMS Land, LLC of Middleton, Delaware.

61.     HasTraffic provided equipment and materials to its telemarketing vendors.

62.     The telemarketing vendors used HasTraffic's online portal to log activities and send text messages on behalf of HasTraffic and Flatiron.

63.     HasTraffic and its vendors entered into contracts which included strict rules as to what telemarketing vendors must state in their marketing messages for HasTraffic and Flatiron.

64.    HasTraffic's telemarketing vendors had little or no discretion as to what could be stated in those text messages and the manner by which the text messages were sent.

65.    HasTraffic required its vendors maintain strict confidentiality as to the text messages sent and their content.

66.    HasTraffic's vendors sent thousands of spam text messages on behalf of HasTraffic and Flatiron, purporting to offer "gas cards" and prizes to consumers and featuring links to Flatiron webpages.

67.    HasTraffic and Flatiron entered into an addendum to a contract that required the SMS messages sent by HasTraffic to conceal the identity of Flatiron. Specifically, the contract required HasTraffic to not use any of Flatiron's brand names, including, but not limited to, EverydayWinner, EverydayWinner.com, Everyday Winner, Everyday Winner.com.

68.    To further conceal Flatiron's identity, the contract between HasTraffic and Flatiron also required HasTraffic to notify "publishers" of Flatiron's trade names and to ensure that the links in the SMS messages sent did not link directly to any of Flatiron's websites.

69.    This addendum modified the agreement between HasTraffic and Flatiron which required that all SMS messages clearly and conspicuously identify the sender of the text message and that said text messages provide a clear and

conspicuous mechanism for consumers to be able to stop receiving future text messages.

70.    As part of the negotiation of this addendum, Ladsilav Nosakovec of HasTraffic and Mr. Kaplan of HasTraffic exchanged multiple e-mails about SMS traffic sent by HasTraffic on Flatiron's behalf. Mr. Kaplan stated, "Hey Lad, can you send me all the push and sms copy you're running for each offer as well as the prelander you're using for each?"

71.    As part of the negotiation, Mr. Kaplan sent another e-mail to Mr. Nosakovec stating, "SMS . . . a) A lot of the copy has [reward] or [rewardname]. What is actually being populated there for each of our offers? b) Another piece of copy is "Congratulations [name], you are among a group of lucky users selected for this promotion! [link] open the gift box and follow steps to get a $1000 gift card now! All our offers are $500 offers please update that amount."

72.    Mr. Nosakovec responded by stating, "1a) Usually the offer name – unclaimed assets credit, Gas Cards, Card Names, etc. Brands in SMS are not being used if that is the question, forbidden for a long time. 1b) I'll change as many as possible. But it will never be 100% as HasTraffic shares the traffic between several advertisers and that's where our power is . . . ."

73.    As discussed below, the text messages sent to Plaintiffs followed the contractual requirements as the text messages did not identify Flatiron or HasTraffic

and provided no mechanism for Plaintiffs to prevent receiving future text messages from Defendants.

74.    Multiple consumers besides Plaintiffs complained to Flatiron about receiving unwanted text messages. On each occasion, Flatiron reached out to HasTraffic to obtain information about the text messages and potential "opt-in" information.

75.    In response to one such complaint, Flatiron's CEO Sujay Jhaveri, stated, "I think what's happening is that the link goes to a generic page hosted by HasTraffic. . . ."

76.    In response to a complaint, Flatiron internally stated, "I think this could be another Has Traffic Affiliate issue . . . ."

77.    On another occasion, Flatiron asked HasTraffic to block text messages sent to a certain number of someone who it believed to be a "known litigator."

**B. <u>Facts Specific to Carrodine</u>**

78.    At all times relevant to this action, Carrodine was the owner, subscriber and primary user of a cell phone. The phone number associated with his cell phone is 702-XXX-9862.

79.    Carrodine registered his number on the Do-Not-Call registry on October 23, 2014, to obtain solitude from unwanted telemarketing calls and text messages.

80.    Carrodine used his cell phone/number primarily for personal purposes, namely, to communicate with friends and family members.

81.    Before HasTraffic and Flatiron commenced their telemarketing campaign, Carrodine had never heard of either company and did not provide either company express written consent to send him marketing text messages.

82.    Carrodine has no prior business relationship with Flatiron.

83.    Carrodine never inquired of Flatiron about any of its services before or at the time he received the text messages at issue.

84.    Carrodine received at least two text messages on his phone from HasTraffic on behalf of Flatiron.

85.    On or about May 9, 2022, Carrodine received a cryptic text message on his cell phone from Flatiron. The phone number that appeared on Carrodine's phone was 1-360-643-5409. The text message stated: "Fuel c89NA.com/t6T5UTHQ."

86.    So as to determine who was sending him the text message, Carrodine clicked the link. Upon clicking the link, Carrodine was directed to a website that asked questions regarding gas prices, how often he filled up his gas tank and how many he miles he drives each week. The website had no indicia of who owned or operated the website.

87.    As the website with the questionnaire did not identify who was responsible for the marketing, Carrodine answered the three questions on the website

to determine who was sending the text messages.

88.    Upon answering the three questions, a box popped up on the screen directing Carrodine to click a "claim" button to "proceed toward" a prize.

89.    Carrodine clicked the "claim" button so as to determine who sent him the unsolicited text message. Upon clicking the "claim" button, Carrodine was directed to a website with address "everydaywinner.com" which asked Carrodine to enter his email address for a chance to "win $500 toward fuel."

90.    Carrodine did not submit his phone number or submit any information that could reasonably be construed as consent to place telemarketing calls/texts while on the subject website.

91.    The website also included a box that could be check to purportedly "double" Carrodine's chance of winning. By clicking the box, Carrodine would receive "offers from **our** marketing partners."

92.    The bottom of the website finally identified Flatiron as the source of the text message.  The website states, in part, "Welcome to Flatiron Media's suites of content and promotions websites."   A true and correct copy of the Flatiron webpage arising from the text message sent to Carrodine by HasTraffic is copied below:



93.    The website further states that "Everyday Winner is a trademark of Flatiron Media, LLC."

94.    The website also includes a privacy policy which is titled "Flatiron Privacy Policy."

95.    The aforementioned transactions on May 9, 2022, shed light on a perplexing text message Mr. Carrodine had received only two days prior.

96.    Specifically, two days before the May 9 text message, on May 7, 2022, Carrodine received a similar cryptic text message on his phone from HasTraffic on behalf of Flatiron. The phone number that appeared on Carrodine's phone as associated with the text message was 1-818-619-6846. The text message stated: "Gasoline is mean 7Tx31.com/t6T5UTHQ."

97.    Details of the messages sent to Carrodine are summarized in the chart

below:

| Date | Number of texting party | Message | Landing page after questionnaire |
|------|-------------------------|---------|----------------------------------|
| 5-7-2022 | 1-818-619-6846 | "Gasoline is mean 7Tx31.com/t6T5UTHQ." | everydaywinner.com |
| 5-9-2022 | 1-360-643-5409 | "Fuel c89NA.com/t6T5UTHQ." | everydaywinner.com |

98.    Flatiron's conduct violated the privacy rights of Carrodine and the putative class members, as they were subjected to annoying and harassing text messages. Flatiron's text messages intruded upon the rights of Carrodine and the putative class members to be free from invasion of their interest in seclusion.

99.    Carrodine found the SMS messages to be annoying, invasive and distracting.

### C. Facts as to Eli Reisman

100.    At all times relevant hereto, Reisman owned a call phone, the number for which was (848) XXX-8097

101.    Reisman's cell phone account/number is registered in his individual name and not in the name of a business.

102.    Reisman's number is a residential line.

103.    Reisman uses the cell phone/number primarily for personal purposes, namely, to communicate with friends and family members.

104.   Reisman registered his number on the Do-Not-Call registry on April 24, 2019, in order to obtain solitude from unwanted telemarketing calls and text messages.

105.   Reisman used his aforementioned cell phone for primarily residential purposes, such as talking with friends and family.

106.   Before HasTraffic and Flatiron commenced their telemarketing campaign, Reisman had never heard of either company and certainly did not provide either company express written consent to receive marketing messages.

107.   Further, Reisman did not have an established business relationship with either company.

108.   On November 20, 2022, HasTraffic sent Reisman a text message on behalf of Flatiron from the number (437) 217-5156 reading "I am ready to mail the $ 499 Gas card that you might have won, set delivery info here klwytc.com/s6AByTfkHb."

109.   Reisman clicked the link in order to ascertain the party/parties texting him without consent.

110.   Upon doing so, Reisman's browser landed on "rewardmonkey.net", which purported to contain a sweepstakes and promotional offer of a $500 gas card.

111.   Thereafter, the website presented a series of questions inquiring about the user's driving habits and instructed Reisman to click a link to "claim a prize."

20

112.    After those items were completed, the sponsor of that "sweepstakes" was disclosed to be Flatiron.

113.    Specifically, the bottom of the website offering the purported $500 gas card read "Welcome to one of Flatiron Media's suites of content and promotion websites.  A true and correct copy of that image is copied below.



114.    In addition to the November 17, 2022, text messages described above, Reisman received at least three additional text messages from HasTraffic on behalf of Flatiron that were substantially similar to the first message.

115.    A chart summarizing the four text messages (including the aforementioned November 17, 2022, text) follows below:

| Date | Number of texting party | Message | Landing page after questionnaire |
|------|------------------------|---------|----------------------------------|
| 11-17-2022 | (845) 784-9847 | ACTION REQUIRED: You might have won a $500 giftcard! Do you want an online voucher or Debt Card shipped? Ovalypatient.com/ORGJd pEys6AbqpA | Everydaywinner.com |
| 11-20-2022 | (437) 217-5156 | I am ready to mail the $ 499 Gas card that you might have won, set delivery info here klwytc.com/s6AByTfkHb . | Everydaywinner.com |
| 11-24-2022 | (949) 418-3382 | Let Me Know Where To Ship The $500 Giftcard YOU might have Won! Urbanycud.com/d084EW MAcx1yWQL | Everydaywinner.com |
| 12-29-2022 | (516) 423-6784 | FOOD STAMPS: You are qualified to get $300 SNAP in Jan: ohazodu.me/TgdVcsoZo E | Everydaywinner.com |

116.    On or around Nov. 21, 2022, after receipt of the first two text messages, Resiman wrote to Flatiron and advised, *inter alia,* that he did not consent to the text messages.

117.    Furthermore, on November 24, 2022, after receipt of the third text message, Reisman wrote to the texting party with the clear instruction "STOP."

118.    Despite those instructions to cease and desist communications, HasTraffic sent at least two additional marketing messages to Reisman, on behalf of Flatiron.

119.    Reisman found the aforementioned text messages to be annoying, distracting and an invasion of his privacy.

## D. Facts as to Kimberly Hudson

120.    Hudson is an individual who at all times relevant to this Amended Complaint has been a citizen of the State of Texas.

121.    At all times relevant to this Amended Complaint, Hudson owned a cell phone, the number for which was (817) XXX-8035

122.    Hudson registered her number on the Do-Not-Call registry on October 17, 2009, in order to obtain solitude from unwanted telemarketing calls and text messages.

123.    Hudson used her cell phone for primarily residential purposes, such as communicating with friends and family.

124.    Before HasTraffic and Flatiron commenced their telemarketing campaign, Hudson had never heard of either company and did not provide either company express written consent to send her marketing text messages.

125.   Furthermore, Hudson did not have an established business relationship with either company.

126.   On May 7, 2022, HasTraffic sent Hudson a text message on behalf of Flatiron from the number purported phone number 650-675-8557, stating, "Fuel for the fire hwwBJ.com/JsauclQq."

127.   Hudson clicked the link to ascertain the party/parties texting her without her consent.

128.   Upon   clicking   the   link,   Hudson's   browser   landed   on "validrewards.com", which purported to contain a sweepstakes and promotional offer of a $500 prepaid card to be used for gas.

129.   The website also presented a series of questions inquiring about the user's driving habits and instructed Hudson to click a link to "claim a prize."

130.   Upon clicking the link, Hudson was directed to a website called "validrewards.com."

131.   Specifically, the bottom of the website offering the purported $500 gas card read "Welcome to one of Flatiron Media's suites of content and promotion websites."  A true and correct copy of an image from the Flatiron website captured by Hudson is copied below:



132.   In addition to the May 7, 2022, text message described above, Hudson received at least two additional text messages from HasTraffic on behalf of Flatiron that were substantially similar to the first message.

133.   In fact, each text message has the same ending to the website referenced in the text message of "JsauclQq."

134.   The following chart identifies the text messages received by Hudson:

| Date | Number of texting party | Message | Landing page after questionnaire |
|---|---|---|---|
| 5-7-2022 | (650) 784-9847 | Fuel for the fire hwwBJ.com/JsauclQq | Validrewards.com |
| 5-16-2022 | (626) 766-0994 | gasoline is mean ayQKi.com/JsauclQq | Validrewards.com |
| 5-18-2022 | (917) 459-5236 | Be prepared 1N2rV.com/JsauclQq | Validrewards.com |

135.   Hudson found the aforementioned text messages to be annoying, distracting and an invasion of her privacy.

## DIRECT AND VICARIOUS LIABILITY

136.    Plaintiffs allege Flatiron and HasTraffic are vicariously liable for SMS text messages sent by their agents and/or anyone acting on their behalf.

137.    On May 9, 2013, the FCC issued its  Declaratory Ruling, advising "sellers" (entities on whose behalf telemarketing calls or texts are sent) may not avoid liability by outsourcing telemarketing to third-parties:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 FCC Rcd 6574 at 6588 (F.C.C. May 9, 2013) (internal citations omitted).

138.    Moreover, the 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*., at 6587 n. 107.

139.   The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

140.   Flatiron and HasTraffic[1] entered into a contract for services.  Through that contract, Flatiron agreed to pay HasTraffic based on the number of "leads" HasTraffic generated for Flatiron /or the quantity of traffic to Flatiron's webpage(s).

141.   In that contract, Flatiron retained the ability to substantially control the marketing activities of HasTraffic. In fact, it was Flatiron webpages that HasTraffic was marketing on Flatiron's behalf.

142.   As HasTraffic explains "The advertiser has control over the text and the ability to pre-approve the copy."  An image copied from HasTraffic's webpage is below (highlight added):

---

[1] Again, by "HasTraffic", Plaintiffs refer to Unlimited Traffic Limited, Sea Ranch International Limited and Sea Ranch International Pte. Ltd. collectively, who work as a "joint enterprise."



143.   Pursuant to the agreement between HasTraffic and Flatiron, HasTraffic (through its own agents) sent SMS text messages on Flatiron's behalf while acting at the direction and under the control of Flatiron.

144.   Because Flatiron had the ability to direct and control the business activities of HasTraffic when it was sending marketing messages on Flatiron's behalf, an agency relationship exists.

145.   Similarly, HasTraffic entered into contracts with its own telemarketing agents to send SMS text messages promoting Flatiron's webpages.

146.   Those contracts provide that HasTraffic will provide equipment to its vendors, through which its vendors will send text messages to consumers.

147.   The HasTraffic contracts with its telemarketing vendors dictate that HasTraffic will provide its telemarketing vendors with the content of the text messages sent to consumers.

148.   HasTraffic's contract with telemarketing vendors contains strict rules prescribing the manner of means of the telemarketers' communications.

149.    Accordingly, the violations of HasTraffic's telemarketing agents in the course of marketing for Flatiron can reasonably be imputed to HasTraffic and Flatiron under the theory of "actual authority" or a traditional agency relationship.

150.    Specifically, HasTraffic is Flatiron's agent, and HasTraffic's telemarketing vendors are HasTraffic's agents and Flatiron's sub-agents.

151.    Furthermore, Flatiron's webpage is published to consumers who click links sent by HasTraffic's agents. Accordingly, there is apparent authority that HasTraffic's telemarketing vendors are acting on Flatiron's behalf.

152.    Furthermore, given the widespread and pervasive TCPA violations in messages purporting to offer rewards and sweepstakes, Flatiron and HasTraffic had reason to carefully scrutinize the marketing activities of HasTraffic's telemarketing vendors.

153.    More immediately, Flatiron and HasTraffic were aware of complaints from consumers about the persistent unwanted text messages.

154.    For instance, on or around July 30, 2020, a consumer made the following complaint to the BBB about Flatiron's telemarketing practices:

> "Whoever those people are need to stop because they text me several times a day offering gifts and money."

155.   By accepting "leads" that came by way of the unlawful telemarketing, where Flatiron and HasTraffic had reason to know of the violations, Flatiron and HasTraffic both ratified  TCPA violations.

156.   Upon information and belief, Defendant Flatiron hired, encouraged, permitted, and enjoyed the benefits of mass spam-marketing by HasTraffic's vendors. Likewise, HasTraffic enjoyed those same benefits of spam-marketing by its own vendors.

157.   Flatiron and HasTraffic are not permitted under the law to outsource and contract their way out of liability by directing and benefitting from  TCPA violations.

158.   For any unlawful marketing messages made by 's HasTraffic's vendors on HasTraffic and Flatiron's behalf, Flatiron and HasTraffic are vicariously liable.

**Class Allegations**

159.   Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiffs bring this lawsuit as a class action on behalf of himself and all others similarly situated.

160.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Carrodine seeks to represent the following class:

> **Do-Not-Call Registry Class:** For the period from four years prior to the filing of this suit until the date a class is certified, all

persons in the United States who: (1) received more than one telephone call or text message from or on behalf of HasTraffic and/or Flatiron; (2) advertising goods or services; (3) during a 12-month period; and, (4) to a phone number that was registered on the Do Not Call Registry for 31 or more days at the time the calls were placed.

161.   Plaintiffs reserve the right to add administrative subclasses, or to amend the definition of the proposed class, as circumstances dictate.

162.   The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds or thousands of people have been harmed by Flatiron and HasTraffic's actions. The names and phone numbers of the members of the proposed class are readily identifiable through records available to Flatiron and/or HasTraffic (or others acting on their behalf).

163.   Members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

164.   On information and belief, Flatiron and HasTraffic has sent text messages to and continues to text people who are registered on the National Do-Not-Call Registry. It is reasonable to expect that Defendants will continue to make such calls absent this lawsuit.

165.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

a.   Whether HasTraffic's vendors sent text messages to Plaintiffs and the putative class members after they were registered on the National Do Not Call Registry more than 31 days;

b.   Whether Defendants' conduct violates 47 U.S.C. § 227(c);

c.   Whether Defendants' conduct violates the rules and regulations implementing the TCPA;

d.   Whether Flatiron's contract and business relationship with HasTraffic creates an agency relationship;

e.   Whether HasTraffic's contracts and business relationships with third-party telemarketers creates an agency relationship;

f.   Whether Flatiron ratified violations by HasTraffic's vendors;

g.   Whether HasTraffic ratified violations by its vendors;

h.   Whether Flatiron created apparent authority as to marketing messages from HasTraffic's vendors on its behalf; and,

i.   Whether Plaintiffs and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendants' conduct.

166.   Plaintiffs' claims are typical of the claims of the proposed class members because his claims arise from the same practice that gives rise to the claims of the members of the proposed class and is based on the same legal theories.

167.   Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict

with the interests of the proposed class they seek to represent. Plaintiffs have retained lawyers who are competent at litigating the TCPA and class-actions.

168.    Plaintiffs' counsel will vigorously litigate this case as a class action, and Plaintiffs' and his counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

169.    A class action is superior to all alternative methods of adjudicating this controversy, including through individual lawsuits. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

170.    In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

171.    Questions of law and fact, particularly the propriety of calling phone numbers registered on the National Do-Not-Call Registry, predominate over questions affecting only individual members.

172.    Defendants acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**COUNT I**
**Violations of the Telephone Consumer Protection Act ("TCPA"),**
**47 U.S.C. § 227 *et seq.***

173.    Plaintiffs incorporate the previous paragraphs as if fully stated in this Count.

174.    The TCPA defines a "telephone solicitation" as a "call or message for the purpose of encouraging the purchase of goods, or services which is transmitted to any person." 47 U.S.C. § 227(a)(4).

175.    The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do-Not-Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

176.    The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the National Do Not Call Registry is $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

177.    In addition, the TCPA allows the Court to enjoin Defendants' violations

of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

178.  By sending marketing messages to Plaintiffs and the putative class members after their numbers were registered on the National Do-Not-Call Registry, Defendants violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

179.  Defendants knew or should have known that Plaintiffs and the putative class members had their numbers registered on the National Do-Not-Call Registry.

180.  Plaintiffs and the putative class members are each entitled to damages of $500.00 per violation for violative call/text up to $1,500.00 per violation if the Court finds that Defendants willfully violated the TCPA.

## DEMAND FOR JUDGMENT

WHEREFORE Plaintiff Jason Carrodine, Eli Reisman and Kimberly Hudson individually, and on behalf of all others similarly situated, under judgment in their favor and against Defendant and requests the Court grant the following relief:

a.    Enter an order against Defendants Flatiron Media, LLC, Defendant Unlimited Traffic Limited, Defendant Sea Ranch International Limited and Defendant Sea Ranch International Pte. Ltd., pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying this action as a class action and appointing Carrodine as the class representative;

b. Enter an order appointing Kimmel & Silverman, P.C. and Butsch Roberts & Associates LLC as class counsel;

c. Enter judgment in favor of Plaintiffs and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation of 47 U.S.C. § 227(b) and $500 per violation of 47 U.S.C. § 227(c), or up to $1,500 per violation of each subsection if Defendants willfully violated the TCPA;

d. Enter a judgment in favor of Plaintiffs and the putative class that enjoins Flatiron from violating the TCPA's regulations prohibiting Defendants from calling numbers registered on the National Do-Not-Call Registry;

e. Award Plaintiffs and the class all expenses of this action, and requiring Defendants to pay the costs and expenses of class notice and administration; and,

f. Award Carrodine, Reisman and Hudson and the class such further and other relief the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiffs demand a jury trial in this case.

Dated:  November 4, 2024                Respectfully submitted,


KIMMEL & SILVERMAN, P.C.


By: */s/ Jacob U. Ginsburg*
Jacob U. Ginsburg, Esq.( *pro hac vice*)
Craig T. Kimmel, Esq.
30 East Butler Ave.
Ambler, PA 19002
Phone: (267) 468-5374
Facsimile: (877) 788-2864
Email: kimmel@creditlaw.com
jginsburg@creditlaw.com
teamkimmel@creditlaw.com

BUTSCH ROBERTS & ASSOCIATES LLC

Christopher E. Roberts (*pro hac vice*)
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700
Facsimile: (314) 863-5711
Email: CRoberts@butschroberts.com

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

I, Jacob U. Ginsburg, Esq. hereby certify that a true and correct copy of the foregoing was served on all parties of record via ECF on November 4, 2024.

*/s/ Jacob U. Ginsburg*